610 A.2d 343

**Donald KIRSCH, et al.**

v.

**PRINCE GEORGE'S COUNTY, Maryland.**

**No. 1653, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

July 8, 1992.

Reconsideration Denied Sept. 1, 1992.

Andrew E. Greenwald (Jay P. Holland and Joseph, Greenwald & Laake, P.A., on the brief), Greenbelt, for appellants.

Sean D. Wallace, Associate County Atty. (Michael P. Whalen, County Atty., Michael O. Connaughton, Deputy County Atty., J. Michael Dougherty, Jr. and Crystal R. Dixon, Associate County Attys., on the brief), Upper Marlboro, for appellee.

Argued before MOYLAN, ROSALYN B. BELL and DAVIS, JJ.

MOYLAN, Judge.

The appellants, Donald P. Kirsch, Martha Kaye Dunn, Stephanie Stockman and Daniel Cones, appeal an Order of Judge Larnzell Martin in the Circuit Court for Prince George's County granting the Motion for Summary Judgment by the appellee, Prince George's County. The appellants essentially raise two contentions:

1) That the Prince George's County Zoning Ordinance CB–152–1989 violates the Prince George's County Human Relations Act; and

2) That the Ordinance deprives the appellants of the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights.

On November 28, 1989, the County Council of Prince George's County, sitting as the District Council ("District Council"), enacted Zoning Ordinance Bill Number CB–152–1989 entitled "Zoning Bill—An Ordinance Concerning Mini Dormitories" ("Mini–Dorm Ordinance"). The Zoning Bill's title describes the Mini–Dorm Ordinance as being:

"FOR the purpose of defining a mini-dormitory; establishing criteria for regulating this use; allowing it as a permitted use or by Special Exception in certain zones, subject to certain criteria; prohibiting the Board of Appeals from granting certain variances for mini-dormitories; prohibiting the Planning Board from approving departures from the required number of parking spaces for mini-dormitories; and requiring all existing uses to be in conformance with these regulations by July 1, 1991."

The objectives of the Mini–Dorm Ordinance were to be accomplished by amendment of §§ 27–107.1, 27–229(b), 27–441(b)(6), 27–515(b)(7), 27–547(b)(7), 27–568 and 27–588(c) of the Zoning Ordinance of Prince George's County ("Zoning Ordinance") and the addition of new §§ 27–249.1, 27–374.1, 27–445.7, 27–532.2, and 27–548.1.2 thereto.

Section 27–107.1(150.1) of the Zoning Ordinance defines "mini-dormitory" as:

"[A]n off-campus residence located in a building that is, or was originally constructed as a one-family, two family, or three-family dwelling which houses at least three (3), but not more than five (5) individuals, all or part of whom are unrelated to one another by blood, adoption or marriage and who are registered full-time or part-time students at an institution of higher learning."

The Mini–Dorm Ordinance amends § 27–441(b)(6) of the Zoning Ordinance, by adding the mini-dormitory as a permitted use in all residential zones provided the use complies with the requirements of § 27–445.7 of the Zoning Ordinance. A mini-dormitory that does not satisfy the requirements of § 27–445.7 is permissible within the affected residential zones only by special exception.

The amended Zoning Ordinance imposes the following requirements on the construction of mini-dormitories and their environs:

"(a) A mini-dormitory permitted (P) in the Table of Uses shall be subject to the following:

(1) The property shall be maintained in accordance with all applicable provisions of the County Code;

(2) Rooms used for sleeping purposes shall have not less than seventy (70) square feet per resident;

(3) All parking spaces shall be provided on-site, in accordance with Part 11;

(4) Parking spaces provided solely for, and on the same lot with, the mini-dormitory may be located one behind the other (the front space may be used as access to the rear space);

(5) The number of driveway entrances authorized shall not exceed one (1) driveway entrance per lot or per street on which the subject lot has frontage (i.e., a corner lot), unless such driveway entrances were in existence on November 28, 1989;

(6) The uses shall not alter the single-family residential character or appearance of the premises;

(7) The maximum percentage of lot coverage for a mini-dormitory shall be the same as that for the dwelling type that was originally constructed on the lot; and

(8) The maximum percentage of lot coverage may only be increased by the District Council in the form of a variance granted in connection with the approval of a Special Exception."

Section 27–249.1 of the Zoning Ordinance provides for the certification of existing uses as nonconforming and permits amortization through July 1, 1991.

As provided by § 27–249.1((b) of the Zoning Ordinance, the purpose of the Mini–Dorm Ordinance is to:

"[P]revent or control the detrimental effects upon neighboring properties, such as illegal parking and saturation of available parking by residents of mini-dormitories, litter, and noise."

The appellants in the instant case are persons who are or might be affected by the Mini–Dorm Ordinance if it becomes effective. Donald P. Kirsch owns a house located at 4805 Rittenhouse Street, Riverdale, from which he has derived rental income. Martha Kaye Dunn is employed in the business of property management. She is the owner of seven houses located in Prince George's County. The appellants Stephanie Stockman and Daniel Cones are students at the University of Maryland, College Park Campus. They reside off-campus and rent living space that would be affected by the Mini–Dorm Ordinance.

The appellee, Prince George's County ("County"), is a political subdivision of the State organized under Article XI–A, Constitution of Maryland, with divers powers ex-

pressed throughout the Annotated Code. Article 28, § 8–101 of the Code provides that with respect to zoning matters, the County Council is designated the District Council. That Section sets out the powers with which the District Council is invested:

"(b) *Grant of zoning power.*—(1) Each district council, respectively, in accordance with the conditions and procedures specified in this article, may by ordinance adopt and amend the text of the zoning ordinance and may by resolution or ordinance adopt and amend the map or maps accompanying the zoning ordinance text to regulate, in the portion of the regional district lying within its county, (i) the location, height, bulk, and size of buildings, other structures, and units therein, building lines, minimum frontages, depths and areas of lots, and percentages of lots which may be occupied; (ii) the size of lots, yards, courts, and other open spaces; (iii) the erection of temporary stands and structures; (iv) the density and distribution of population; (v) the location and uses of buildings and structures and units therein for trade, industry, residence, recreation, agriculture, public activities, and other purposes; and (vi) the uses of land, including surface, subsurface, and air rights therein, for building, trade, industry, residence, recreation, agriculture, forestry, or other purposes."

Seeking to enjoin the County from enforcing the Mini–Dorm Ordinance, the appellants filed a Motion for Interlocutory Injunction in the Circuit Court for Prince George's County on February 14, 1991. The appellants' motion was granted. The appellants also filed a Motion for Summary Judgment in the Prince George's County Circuit Court on February 14. The County filed its own Motion for Summary Judgment in that court on March 28. Judge Martin granted the County's Motion. By Order dated August 1, 1991, Judge Martin ruled that the Mini–Dorm Ordinance was constitutional and did not infringe upon the appellants' rights. This appeal followed.

The appellants contend that the Mini–Dorm Ordinance violates the Prince George's County Human Relations Act. Secondarily, they argue that the Ordinance contravenes the Equal Protection Clause of the Fourteenth Amendment. We address the appellants' second argument first, as it is dispositive of both contentions.

It is beyond cavil that "[w]hen a local legislative body enacts a zoning ordinance, pursuant to powers granted by the Legislature," there is a strong presumption of validity, and " 'strong evidence' of error is required to overcome the presumption." *Cardon Investments v. Town of New Market*, 55 Md.App. 573, 579, 466 A.2d 504 (1983), *aff'd* 302 Md. 77, 485 A.2d 678 (1984); *Howard County, Md. v. Dorsey*, 292 Md. 351, 355, 438 A.2d 1339 (1982). *See Mayor and Aldermen of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 394, 396 A.2d 1080 (1979) (where legislative body has 'enacted zoning ordinance under powers granted by Legislature, presumption of validity attaches to act as exercise of police power'). Moreover, in reviewing zoning or rezoning by the County Council acting in its legislative capacity, "the function of this Court is a narrow one." *Bishop v. Board of County Com'rs of Prince George's County*, 230 Md. 494, 501, 187 A.2d 851 (1963). Unless the action is "arbitrary, capricious, unreasonable, discriminatory or beyond statutory or constitutional limitations, the courts *cannot* set it aside." *Id.* (emphasis added). The burden is upon the party challenging the validity of the zoning ordinance to demonstrate its invalidity. The appellants have failed to meet that burden.

 A municipality or county may, for a legitimate zoning purpose, "distinguish among occupants making the same use of single-family dwellings." *Y.W.C.A. of Summit, N.J. v. Bd. of Adj., Summit*, 141 N.J.Super. 315, 358 A.2d 211 (N.J.Super. A.D., 1976), *aff'g* 134 N.J.Super. 384, 341 A.2d 356 (N.J.Super.L., 1975). *Accord City of White Plains v. Ferraioli*, 34 N.Y.2d 300, 357 N.Y.S.2d 449, 313 N.E.2d 756 (1974); *Township of Ewing v. King*, 131 N.J.Super. 29, 328 A.2d 242 (1974), *rev'd on other grounds*, 69

N.J. 67, 350 A.2d 482 (1976). This includes distinctions made between students and non-students. *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (Stewart, Rehnquist, JJ., dissenting); *Ferraioli,* 357 N.Y.S.2d 449, 313 N.E.2d 756; *City of Long Beach v. California Lambda etc. Fraternity,* 255 Cal.App.2d 789, 63 Cal.Rptr. 419 (2 Dist., 1967); *Pettis v. Alpha Chapter of Phi Beta Pi,* 115 Neb. 525, 213 N.W. 835 (1927).

A county's desire to eliminate or ameliorate property uses that conflict with a "stable, uncongested single family environment" is among the zoning purposes considered "legitimate" by courts. *Ferraioli,* 357 N.Y.S.2d at 451, 313 N.E.2d at 758. *See Village of Belle Terre,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). When " 'intensity of use, i.e., overcrowding of dwelling units and facilities,' is a factor in causing anti-social conduct, zoning ordinances can ... be used for the purposes of control." *Township of Ewing v. King,* 328 A.2d at 243 (quoting *Kirsch Holding Co. v. Manasquan,* 59 N.J. 241, 254, 281 A.2d 513 (1971). *Accord Y.W.C.A. of Summit v. Board of Adjustment,* 341 A.2d 356.

In *Village of Belle Terre,* the zoning ordinance at issue restricted land use to one-family dwellings and prohibited occupancy of a dwelling by more than two unrelated persons "as a family." The ordinance permitted, however, occupancy by any number of persons related by blood, adoption or marriage. A property owner who rented his property to six unrelated college students challenged the ordinance after he was cited for its violation. The Supreme Court upheld both the zoning ordinance and the principle of land use restriction upon which it was founded. In so doing, it observed at 416 U.S. at 9, 94 S.Ct. at 1541, that:

> "The regimes of boarding houses, fraternity houses, and the like present urban problems. More people occupy a given space; more cars rather continuously pass by; more cars are parked; noise travels with crowds.

A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land use project addressed to family needs. This goal is a permissible one. The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion, and clean air make the area a sanctuary for people." (citation omitted).

In *White Plains v. Ferraioli,* the issue before the New York Court of Appeals was whether a "group home," consisting of a married couple and their two children, together with 10 foster children, qualified as a single family unit within the meaning of the City's zoning ordinance. In reaching its conclusion that a group home was a single family unit, the Court distinguished the attributes of a group home with those of a dwelling housing students. It observed that:

"The group home is not, for purposes of a zoning ordinance, a temporary living arrangement as would be a group of college students sharing a house and commuting to a nearby school (cf. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 [1974] ). Every year or so, different college students would come to take the place of those before them. There would be none of the permanency of community that characterizes a residential neighborhood of private homes.

... High density uses, for example, may be restricted; so too those uses which are associated with occupancy by numbers of transient persons may be limited.

. . . .

... So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance."

*Ferraioli,* 357 N.Y.S.2d at 451, 313 N.E.2d at 758.

■ In the case *sub judice,* the Mini–Dorm Ordinance was enacted by the County in an effort to mollify the

potentially irksome conditions emanating from student housing and impacting detrimentally upon the surrounding residential community. As observed above, this is undoubtedly a legitimate goal of government. Furthermore, the group or class of persons affected by the Mini–Dorm Ordinance—students attending institutions of higher learning—is directly responsible for the problems the County seeks to eliminate. As the California Court of Appeals observed in *City of Long Beach:*

> " 'And ... speaking of college students generally, the court observes that it is a matter of common knowledge and well established that groups of students are for the most part exuberant, boisterous, and hilarious, and that they do not ordinarily keep regular hours and are addicted to the use and abuse of vibrant and sonorous musical instruments.' "

255 Cal.App.2d at 796, 63 Cal.Rptr. 419 (quoting *Pettis*, 213 N.W. at 837–838). *See Mayor & City Council of Baltimore v. Poe*, 224 Md. 428, 435, 168 A.2d 193 (1961) (observing that "youth tends to overflow with exuberance to the point of creating disturbance and disorder"). The method devised by the County to actualize its goal was rational.

The appellants argue that the Mini–Dorm Ordinance impermissibly discriminates against a "protected" or "suspect" class—students—and impinges upon a "fundamental right"—freedom of association. They contend that, as a result, the Mini–Dorm Ordinance violates the Equal Protection Clause of the Fourteenth Amendment and the equal protection guarantee of Article 24 of the Maryland Declaration of Rights. They assert that because of the status of its targets, the Mini–Dorm Ordinance must be analyzed under the rigorous "strict scrutiny" standard in order to determine whether it passes constitutional muster. The appellants are in error.

The Supreme Court has strictly limited the application of the "strict scrutiny" standard of review in cases involving the equal protection guarantee to two situations: 1) where a governmental classification distinguishes between persons

upon a "suspect" basis and 2) where a governmental act classifies people in terms of their ability to exercise a fundamental right. J. Nowak, R. Rotunda, J. Young, *Constitutional Law* § 14.3, at 530–31 (3d ed. 1986). With regard to the first situation, laws that classify persons on the basis of either their "status as a member of a racial minority or on the basis of their national origin will be deemed suspect." *Id.* at 531. The Supreme Court has also held that "laws which classify persons in terms of alienage ... will be deemed suspect and subject to this test." *Id.*

 The appellants, as students, are not members of a suspect class. Furthermore, the Mini–Dorm Ordinance does not burden a "fundamental right." The appellants' claim that the ordinance in question invades constitutionally protected rights of association and privacy was answered by the Supreme Court's *Belle Terre* decision. The argument was there made that "a municipality could not zone its land exclusively for single-family occupancy because to do so would interfere with protected rights of privacy or association" of students. *Moore v. East Cleveland*, 431 U.S. at 534, 97 S.Ct. at 1953. The *Belle Terre* Court rejected that contention and held that "the ordinance at issue 'involve[d] no fundamental right guaranteed by the Constitution, such as ... the right of association.'" *Id.* "The *Belle Terre* decision thus disposes of the appellants contention to the extent they focus ... on general notions of" association or privacy. *Id.*

The appellants contend, subsidiarily, that "even under a rational basis standard of review, the Mini–Dorm Ordinance is an unreasonable exercise of the County's zoning power." Once again, the appellants miss the mark. Under the "rational basis" standard of review, a court is to ask only "whether it is conceivable that the classification bears a rational relationship to an end of government which is not prohibited by the Constitution." J. Nowak, § 14.3, at 530. It has been said that "so long as it is arguable that the [legislative body] had such a basis for creating the classification a court should not invalidate the law." *Id.* We have

already concluded that a rational relationship exists between the classification at issue, and the legitimate, lawful goal that the legislation was designed to achieve. Consequently, there is no equal protection violation.

The appellants' assertion that the Mini–Dorm Ordinance violates Article 24 of the Maryland Declaration of Rights will not detain us long. The Maryland Constitution contains no equal protection clause. It has been held, however, that "the Due Process Clause of the Maryland Constitution, contained in Article 24 of the Maryland Declaration of Rights, embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment." *Murphy v. Edmonds*, 325 Md. 342, 353, 601 A.2d 102 (1992). The courts of this State have "taken the position that the Maryland equal protection principle applies 'in like manner and to the same extent as' the Equal Protection Clause." *Id.* at 354, 601 A.2d 102 (quoting *Attorney General v. Waldron*, 289 Md. 683, 704–705, 426 A.2d 929 (1981)). Thus, United States Supreme Court opinions "concerning the Equal Protection Clause ... 'are practically direct authorities' with regard to Article 24." *Id.* (quoting *Waldron*, 289 Md. at 705, 426 A.2d 929). In light of our conclusion that the Mini–Dorm ordinance does not violate federal equal protection law, *a fortiori*, it does not violate Article 24.

■ The appellants contend that the Mini–Dorm Ordinance is unconstitutional because it is "overbroad and vague and therefore is not 'narrowly tailored.'" Two closely related doctrines "particularly important in dealing with free speech issues" are the dual prohibitions against overbreadth and vagueness of a statute. J. Nowak, § 16.8, at 840. Essentially, these doctrinal guideposts ensure that, in those instances where the State does have the power to regulate an area, that power is exercised so it does not, " 'in attaining a permissible end, unduly infringe the protected freedom.'" *Id.* (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)). A vagueness-overbreadth inquiry "focuses on whether a law

states its requirements in terms" so vague and/or overbroad "that persons of reasonable intelligence 'must necessarily guess at its meaning' " and scope. *Landover Books v. Prince George's County*, 81 Md.App. 54, 81, 566 A.2d 792 (1989) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973)).

Having considered the language of the Mini–Dorm Ordinance, we hold that it is neither "overbroad" nor "vague." Even if we had determined that the ordinance was overbroad or vague, however, this would not necessarily lead us to conclude that the ordinance was unconstitutional. The two closely related doctrines of overbreadth and vagueness were primarily designed to ensure that laws that regulate fundamental constitutional rights, "such as the freedoms of speech, assembly, or association," are not so vague or overbroad that they have an " 'in terrorem' effect, deterring persons from engaging in activities ... that are of particular constitutional importance." J. Nowak, § 16.9, at 846. "An unclear law relating to business property use, such as a zoning statute," by contrast, "would only chill activity without special constitutional significance (until such time as the statute is clarified by appropriate state courts)," and result in no constitutional violation.

■■ The appellants go on to assert that, quite aside from its alleged constitutional infirmities, the Mini–Dorm Ordinance violates the Prince George's County Human Relations Act ("Act"). Prince George's County Code, 1987 Edition, as amended, §§ 2–185, *et seq.* The language of the Act indicates otherwise. Section 2–185(a) of the Act provides in relevant part:

"It shall be a function of the County government to foster and encourage the growth and development of the County in such a manner that all persons shall have an equal opportunity to pursue their lives free of discrimination imposed because of race, creed, color, sex, national origin, age, occupation ... Discriminatory practices based

upon the foregoing criteria are declared to be contrary to the public policy of the County."

Section 2–186(a)(3) defines "discrimination" as:

"[A]cting or failing to act, or unduly delaying any action regarding any person because of race, creed color, sex, national origin ... occupation ... in such a way that such person is adversely affected in the areas of housing, employment ..."

Significantly, "occupation" is defined as:

"[T]he principal lawful activity of one's life. Persons to be protected include but are not limited to students, welfare recipients, retired persons, physically or mentally handicapped persons ... and any persons irrespective of income *who are denied the equal protection of the laws.*" (emphasis added).

Section 2–186(a)(12). According to the context of the plain language of the Act, the Mini–Dorm Ordinance does not violate its terms. The appellants would have us hold that the Act prohibits the County from imposing upon any of the groups enumerated in the Act any and all legislatively selected distinctions between those groups and others. The Act does not sweep so broadly. By its own terms, the Act seeks to ensure only that those groups—students, retired persons, etc.—are not "denied the equal protection of the laws." As we have already held, the Ordinance does not deny equal protection.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.*